ESSEX COUNTY ORPHANS COURT.

In the matter of the estate of JOSEPH VESPER, deceased.

[Decided September 17th, 1926.]

**Wills—Probate—Testamentary Capacity—Testator, a Very Sick Man, Had Lawyer Prepare Will in Many Respects Similar to an Earlier Will—Evidence Regarding Testator's Capacity on Day of Executing, Conflicting, but Testimony of Lawyer and of Physician Seems Sufficient to Indicate Sufficient Capacity—Will Admitted to Probate.**

On *caveat* against probate of will.

*Messrs. Heine, Bradner & Laird* (by *Mr. Bradner*), for the proponents.

*Messrs. Howe & Davis* (by *Mr. Filz Maurice*), for the caveator.

KOCHER, ADVISORY MASTER.

Joseph Vesper, late of the county of Essex, died on the 17th day of March, 1926, leaving a paper-writing purporting to be his last will and testament. A *caveat* against the probate of the said paper-writing was filed by Carrie Lehmann, who, while not a next of kin of testator, and, therefore, without standing to *caveat* in that capacity, was, however, the beneficiary named in an earlier will, under which she would receive more than she received under the provisions of the will in question.

Testator left him surviving as his nearest of kin a sister, Mary Salzmann, and his father, Joseph Vesper, who both reside abroad. Testator was in the habit of visiting his father and sister from time to time, making visits extending over as long a period of time as six months. He also left two step-children, the children of his deceased wife by a former marriage, John and Louis Koller by name.

Essex County Orphans Court—In re Vesper.

At the time of his death, testator was residing with Mr. and Mrs. Lehmann, his sister-in-law and brother-in-law, he having married Mr. Lehmann's sister. He had been living with them ever since the death of his wife in 1923, and their acquaintance with him practically began from the time of the death of his wife, the testimony being that he rarely visited them prior to that date.

The will was prepared by Frederick W. Wilderotter, a member of the bar of this state, who had represented testator in numerous transactions and who had prepared at least one other will for him. Testator also left with Wilderotter his securities and other valuable papers while absent visiting his relatives abroad. The circumstances attending the preparation and execution of the will as testified to by Mr. Wilderotter as follows:

On the 15th of March, 1926, Wilderotter received a call from Mrs. Lehmann that Vesper wished to see him and that he was very sick. He went up to see Mr. Vesper and was shown to his room by Mrs. Lehmann. Mr. Vesper asked him to close the door and told him he wished to draw his will. Vesper was sitting up in bed and gave him instructions as to the manner in which he wished to dispose of his property, after which Wilderotter went to his office to prepare the will and returned to Vesper's house in the afternoon for the purpose of executing it; he took with him his stenographer to be used as a witness, as he did not know whether any other witnesses would be available or not.

When he arrived at testator's home he found that his brother, Philip Wilderotter, and his wife were present in the parlor, they having come to see Mr. Vesper in response to a call from Mrs. Lehmann advising them that he was very ill, the Wilderotters being distant relatives of testator. Wilderotter went alone to Mr. Vesper's room, read the will to him and asked him if it was satisfactory, and was told that it was. He then asked testator who he wished to witness the will, and suggested that inasmuch as his brother Philip was downstairs, that he could act as a witness, and that he, Frederick

Wilderotter, could act as the second one. This arrangement being agreeable to the testator, Philip Wilderotter was called and the two went upstairs together. Testator then asked for a newspaper or magazine on which he could sign his name, and one was secured and he was propped up and signed the will in the presence of the two Wilderotters. After he signed his name testator said: "Would it make any difference if Mr. Lehmann would sign his name as a witness?" adding that "it did not look well if he did not ask Mr. Lehmann to sign," to which Wilderotter replied, "No, it is not too late." So Mr. Lehmann was called into the room and Wilderotter told him that Mr. Vesper had signed the will and wanted him to sign as a witness, too. He then asked Mr. Vesper, in the presence of his brother and Mr. Lehmann, wrether the paper-writing was his last will and testament, and whether he knew the contents and wanted them to sign as witnesses, to which testator replied, "Yes." Thereupon, Mr. Lehmann, Mr. Philip Wilderotter and Mr. Frederick Wilderotter all signed the will as witnesses in the presence of testator and of each other. Mr. Lehmann was not present at the time testator signed the will, and it is questioned whether or not testator acknowledged his signature before Mr. Lehmann. Inasmuch as there was a complete execution of the will in manner and form called for by the statute in the presence of the two Wilderotters, this question becomes purely academic and need not be considered.

The testimony of Philip J. Wilderotter as to the circumstances attending the execution of the will is practically identical with that of his brother.

As has already been stated, the will was duly executed in the presence of two witnesses, present at the same time, who testified positively to all of the essential requisites to the execution of a valid will, and there can be no question but what the same was duly executed; in fact, the question of the due execution of the will has not been mooted, the attack being solely on the ground that the testator lacked testamentary capacity.

On this question the testimony is hopelessly in conflict. Wilderotter says that upon his call in the morning the testator, as has already been stated, conversed with him, although with difficulty; that he knew what property he possessed and what he wished to do with it, and that he was familiar with his estate and the persons who were the natural objects of his bounty. The will named Frederick Wilderotter as executor, as did a previous will drawn by Wilderotter. While testator was a very sick man and spoke with difficulty and with an effort, nevertheless, he did give him all of the facts which he afterward incorporated into the paper-writing offered for probate; that when he went to Vesper's house in the afternoon to execute the will, testator was fully conscious of what he was doing; that he read the will over to him and he expressed himself fully satisfied with the contents and, as has already been said, requested that Mr. Lehmann act as a witness.

The will thus executed was not an unnatural one. It gave $10,000 each to his father and sister in Germany, remembered Mrs. Lehmann, as well as his step-sons, contained two charitable bequests, and gave the residue to charity.

Eugene J. Lehmann, the third witness to the will, and the husband of Carrie Lehmann, one of the beneficiaries thereunder, says that upon being called to the room by Frederick Wilderotter, he found Vesper lying on his side, facing a window, with his back turned toward the occupants of the room; that Wilderotter had a paper in his hand which he showed him and said: "Don't you think Mr. Vesper can write his name nice yet?" That he replied: "I suppose, I couldn't see no name or nothing;" that he was thereupon requested to sign the paper without being told the nature of the document he was witnessing; that the two Wilderotters signed after him, and that he had no idea what it was he was signing, and that it was his custom to sign papers presented to him without inquiring as to their contents. Notwithstanding this fact, Mrs. Lehmann testified that her husband told her after he came downstairs that he had signed

a will. He also testified that during the whole proceeding Mr. Vesper lay with his eyes closed, showing no signs that he was paying any attention to what was transpiring. Mr. Lehmann further testified that testator had been unconscious for about four days prior to the execution of the will.

Mrs. Lehmann testified that she attended to Vesper's needs during his entire sickness, but that she had not had any conversation on the 15th instant, as he was unconscious all of that day, but when asked as to whether during her attendance upon him Vesper replied to her questions, she answered, "not all the time;" that in giving him medicine or nourishment testator sometimes took the spoon and fed himself, and, when a glass of liquid was offered to him, he would take ahold of the glass and tip it toward his mouth. She also testified that on the morning of the 15th Vesper told her that he needed to use his bedpan, which she procured for him.

Mrs. Scherer, a neighbor, who had come in to help Mrs. Lehmann on the 15th, testified that she saw testator many times during the day and that she assisted Mrs. Lehmann in placing poultices upon him; that he was unable to talk except on two occasions, on one of which he complained that a poultice was too hot, and on the other occasion, while Mrs. Lehmann and herself were preparing a table by his bedside for the administration of the last rites of the church, and they were considering what to use to sprinkle holy water with, Vesper suggested that a little cotton would do.

Vera Sharp, a nurse, who was called in to attend Mr. Vesper during the night of the 15th, testified that during the night he was in a semi-stupor, that he could say yes or no, but very seldom, and was unable to hold any protracted conversation, and that he was unconscious when she left in the morning. She also said that when she first came she was introduced to Mr. Vesper, who shook hands with her and said, "Yes, yes, yes."

On behalf of the proponent, Father Kurz testified that he attended on the morning of the 15th to administer to

testator the last rites of the church; that Vesper appeared to understand him and that he received responsive answers to questions asked him; that his condition was "semi-conscious, but he could be aroused to almost consciousness."

Dr. Henry Norris, who called upon Vesper in a professional capacity twice on the 15th, said that he found him critically ill, but that upon being questioned, his answers were responsive; that he thought he was able to hold a lengthy conversation if he cared to, but inasmuch as talking was more or less painful, he, apparently, avoided conversation as much as possible. The doctor further said that testator's condition was not comatose at either of the times when he saw him, either in the morning or in the afternoon.

It is a settled policy of the courts of this state to guard the right of testamentary disposition jealously. They hold that this right may be exercised by a person of very moderate capacity. *In re Haness' Estate, 3 N. J. Adv. R. 1651; Loveridge* v. *Brown, 3 N. J. Adv. R. 1050.*

There can be no doubt that testator was very ill and was, in fact, dying, but the mere fact that a person is dying at the time of the execution of a will, standing alone by itself, is not sufficient to invalidate the will if it is shown that the dying person possessed testamentary capacity. *Harris* v. *Betson, 28 N. J. Eq. 211; In re Gahagan, 82 N. J. Eq. 601; Andrew's Case, 33 N. J. Eq. 514; Ayres* v. *Ayres, 43 N. J. Eq. 565; O'Brien* v. *Dwyer, 45 N. J. Eq. 689.* It is also settled that the burden of proof is upon the party attacking the testamentary capacity of the testator. *Trumbull* v. *Gibbons, 22 N. J. Law 117; Elkington* v. *Brick, 44 N. J. Eq. 154; Smith* v. *Smith, 48 N. J. Eq. 566; In re Craft's Estate, 85 N. J. Eq. 125.* The question thus arises, has this burden imposed upon the caveator been sustained by her?

While the testimony is in hopeless conflict and there is testimony to the effect that testator was unconscious for from three to four days prior to his death, still, this is contradicted by other testimony, and it would appear to be largely, if not entirely, offset by the testimony of Dr. Norris, an en-

tirely disinterested witness, who stated that testator was not in a comatose condition at any time during the 15th of March, the day of the execution of the will, and was during that day able to carry on an extended conversation if he cared so to do. The testimony of the Lehmanns is very unconvincing; they contradict themselves and each other, and, to use a mild term, is equivocal, and the same may be said of the other witnesses called by caveators with the exception of Vera Sharp, who attended testator one night, and whose opportunity of observing his condition was so slight as to make her testimony of little value.

There is another feature to this case which plays a large part in its disposition. The testator gave his instructions to Wilderotter, a member of the bar of New Jersey, of unsullied reputation, who testifies positively and without equivocation that he received the instructions as to what the will should contain from Mr. Vesper, and that Mr. Vesper clearly made his wishes known. His testimony and that of his brother at the time of the execution of the will is equally positive as to the competency of the testator to execute the will, and, as a matter of fact, the will bears what purports to be the testator's signature, which must have been made either by the testator himself or else by one of the Wilderotters, which latter supposition is not worthy of the slightest consideration. Another significant fact is that it was testified that when Wilderotter was about to leave, Mrs. Lehmann told him that Vesper had already made a will, and that Wilderotter requested her to show it to him, but that she declined so to do. The will in question was admitted in evidence and was executed by Vesper on the 18th day of October, 1924; it was drawn by the Lehmann's attorney, and was, as to the general legacies therein contained, identical to the last will drawn by Wilderotter, the only real difference being that in the earlier will Mrs. Lehmann was named as residuary legatee and Mr. Lehmann was named as executor, while in the latter will Mrs. Lehmann was given $500 and an additional $500 if there were sufficient assets to pay the

same, and the residue was given to charitable purposes. The fact that, in total ignorance as he was as to the contents of the earlier will, Wilderotter was, nevertheless, enabled to duplicate it in most of its essential features, shows that he must have obtained the information from Vesper.

I have not overlooked the testimony of Mr. Edward Davis, who states that he received a message on March 16th from the Lehmanns that Mr. Vesper was very ill and requested him to call for the purpose of making a will, and that he went there with all the paraphernalia necessary for that purpose and upon being admitted to Vesper's room was unable to arouse him, and, therefore, left without attempting to prepare a will. In the first place, his testimony relates to a condition twenty-four hours after the will in question was executed, and Dr. Norris testified that on March 15th Vesper was in a rapidly declining condition of health, and, in the second place, it is passing strange that the Lehmanns, who testified that Vesper had been unconscious for four days prior to March 15th, and was entirely incapable of executing a will on that date, should, on March 16th, call an attorney for the purpose of having him prepare a will.

I will advise a decree admitting the will to probate.